Plaintiffs, William C. Cantrell and his wife Marydean Cantrell, appeal from the summary judgment entered against them and in favor of defendant, City Federal Savings and Loan Association. We affirm.
In April 1978, the Cantrells purchased a building for $455,000.00 and financed this purchase through City Federal, giving City Federal a first mortgage on the property. *Page 748 
The mortgage given to City Federal had an interest rate of 10 1/2%. In January 1979, the Cantrells decided to sell the building, and signed an exclusive authorization to sell in favor of W.H. Mullins Associates, Inc., a land investment firm. This agreement specified that the Cantrells would be willing to take a "wraparound" second mortgage for any balance due them from the purchaser. William Mullins, of the investment firm, represented the Cantrells in a meeting with Jesse Miller, chairman of the board and president of City Federal, to see if a wraparound mortgage would be acceptable to City Federal. According to the affidavits of William Cantrell and Mullins, Miller told Mullins that a wraparound mortgage would "be no problem."
On March 28, 1979, the Cantrells signed a real estate contract to sell the property to Floyd and Betty Norris for $825,000.00. The contract also included a statement that the sellers would hold a wraparound mortgage at 10 1/2% for 22 years. Shortly thereafter, Mullins was informed by City Federal that the interest rate on the first mortgage would be raised to 11 1/2% as a result of the contemplated transfer to the Norrises. Subsequently, William Cantrell and W.H. Mullins met with Jesse Miller at City Federal, and at this time Miller confirmed City Federal's intention to raise the interest rate. This was reiterated in a letter sent on May 22 from Norman Pless of City Federal to the Norrises, which informed the Norrises that their credit had been approved and showed an interest rate increase from 10 1/2% to 11 1/2%, and indicated that a transfer fee of $250.00 would be charged. A copy of this letter was mailed to the Cantrells.
On June 11, William Cantrell sent a letter to City Federal in which he again stated that he was interested in a wraparound mortgage arrangement with the Norrises, and asked City Federal to outline its requirements for such an arrangement. In response, City Federal again set forth the terms as described in the May 22 letter sent to the Norrises — that the interest rate would be 11 1/2% and a $250.00 transfer fee would be charged.
Although they had been orally reassured by the Cantrells on several occasions that the interest rate on the first mortgage would remain at 10 1/2%, the Norrises requested written confirmation of this from City Federal, because, according to their attorney, use of a wraparound mortgage necessarily would "spark the escalation of a conventional mortgage."
After failing to receive the requested confirmation, the Norrises abandoned the sales contract. The Cantrells were then sued by Champion Realty Company (the realty company employed by the Norrises) for one-half the commission from the aborted sale, and the jury returned a verdict against the Cantrells for $20,625.00. The Cantrells also claim that they had to pay $30,000.00 to the Norrises so that the Cantrells could remove the Norrises' claim to the property.
The Cantrells filed suit against City Federal, alleging that it had agreed not to escalate the interest rate on the first mortgage and then had breached that agreement, and that as a result they were damaged. City Federal filed a motion for summary judgment, which the court granted, and this appeal followed.
The following excerpts from William Cantrell's deposition set forth his testimony concerning his agreement with City Federal:
 "Q. All right. What understanding did you have about the City Federal mortgage remaining at ten and a half percent in view of this proposed sale or after this sale if it had been effected?
 "A. I am sorry. Would you repeat the question? My mind wandered.
 "Q. Well it wasn't a very good question, anyway. What was the interest rate on the City Federal loan that you made?
 "A. I believe it was ten and a half, without looking.
 "Q. All right. Yes. Ten and a half is what the note says, anyway. Now, I take it from the provision in this contract, Defendant's Exhibit Six or at least *Page 749 
page one of it, Defendant's Exhibit Six, that somebody was operating with the idea that the City Federal mortgage interest rate of ten and a half percent would stay the same, is that correct?
"A. Yes.
 "Q. All right. Question, on what did you base your assumption — I am assuming it was your assumption — that the City Federal mortgage interest rate of ten and a half percent would stay the same on a sale or after a sale of the property?
 "A. On the fact that Bill Mullins had told me that the wraparound mortgage would be acceptable to City Federal and — you mean, when this was signed?
 "Q. Yes, right. In March of '78, right around the immediate time that the Norris contract was signed?
"A. Okay.
"Q. What was your understanding?
 "A. My understanding was that Jesse Miller with City Federal had told Bill Mullins, the broker, that a wraparound mortgage was okay with City Federal.
"Q. Anything else?
"A. That is enough.
 "Q. All right. That a wraparound mortgage was okay with City Federal?
"A. Yes, that we could wrap their mortgage, right.
 "Q. Did Mr. Mullins say anything to you other than that in connection with a conversation that I understand he did have with Jesse Miller other than what you had told us?
"A. At that time, I don't recall anything.
"Q. At that time?
 "A. Everything was okay. We could do what we wanted, what we planned to do.
 "Q. Did he tell you that he had discussed interest rates with Jesse Miller specifically?
"A. Specifically at that time, no.
 "Q. He told you essentially what you have just told us?
"A. That is right.
"Q. The best that you recall?
"A. Right.
". . .
 "Q. Tell me the best you can, word for word, what was said about the earlier conversation by all the parties there and what position each of the parties there took about the first conversation between Mr. Mullins and Mr. Miller?
"A. Their position about their conversation?
"Q. Yes, sir.
"A. All right.
"Q. The contents of it and their position about it.
 "A. Well, my recollection is that Bill told Jesse that, said — `you remember me coming down here and discussing this mortgage with you and that we — and, I asked you could it be on a wraparound mortgage and you told me it would be no problem.'
 "And, I think he — I don't know whether he mentioned the price at that time or not. But anyway, I think Jesse had asked him what it was going to be sold for in the first conversation and he told him a million dollars, something around a million dollars.
 "But anyway, it seemed to me that they just said, `Well, regardless we're going to raise the interest rate. We can and we are going to do it.' That was the opinion — I mean that was expressed by Jesse Miller and Mr. Gardner.
 "Q. Did Mr. Mullins suggest to Mr. Miller that he had made a promise or commitment to leave the interest rate at ten and a half percent?
"A. Specifically?
"Q. Yes, sir.
"A. I don't recall.
 "Q. Did Mr. Miller make any statement from which you inferred that he had made a commitment orally to leave the interest rate at ten and a half percent?
"A. Yes.
"Q. All right. Tell me about that. What did he say? *Page 750 
 "A. Well, when he said that he'd accept a wrapround, that means you're going to leave the interest as it is and the — every other thing in place.
 "Q. All right. That is what you say a wrapround means. What discussion did you four gentlemen have that day about that point? Was there any discussion about your understanding of what a wraparound was and what I take their understanding of the wraparound was? Did ya'll get into that?
 "A. There wasn't any reason to have a discussion. They sat there and very firmly and stiffly told us that they were going to raise the interest rate. There is no need for discussion. What could you discuss?
"Q. Well, if Mr. Miller or Mr. Gardner say —
 "A. Let me add something. I do believe that they pulled out a copy of the mortgage.
"Q. Yes, sir.
 "A. And read the section relative to the increase in — the rights to increase interest rates on sale, transfer, assignment and whatever, out of the mortgage. I believe that happened.
 "Q. All right. Did you or Mr. Mullins say to Mr. Miller or suggest to Mr. Miller that in your opinion or otherwise he had made a commitment earlier to leave the interest rate alone at ten and a half percent?
"A. Specifically in that language?
"Q. Yes, sir.
"A. No."
The trial court also had before it affidavits of William Cantrell and Mullins. The pertinent portion of Mullins's affidavit reads:
 "Following the signing of our listing agreement, I went directly to Jesse Miller for the specific purpose of determining if a wraparound situation as contemplated in the listing agreement would be acceptable to City Federal where they would still be involved as the first mortgagee. Upon asking Jesse about their position relative to the use of a wraparound, he replied `this will be no problem.'"
Regarding Mullins's statement about what was contemplated in the listing agreement, the only reference that document made to the first mortgage was:
 "10% of gross sale price in case; balance to be paid over a 25 year period. Interest on unpaid balance — 8%. Balance to be secured by a wrap-around (2nd mortgage) in favor of the seller."
There is no reference whatsoever in the listing agreement to the original interest rate of 10 1/2% — it merely states that a wraparound mortgage would be used to secure the balance of the debt. As the trial court stated in its order granting summary judgment:
 "The Court finds that there was no contract. There was no evidence that the parties mutually assented to any terms. Board of Commissioners of Alabama State Bar v. Jones, 291 Ala. 371, 281 So.2d 267 (1973). No binding contract can come into being until there is a meeting of minds. Sunnyland Mobile Homes, Inc. v. Thompson, 384 So.2d 1111 (Ala.Civ.App. 1980). In this case the parties to the alleged contract did not move beyond the term `wrap-around mortgage' to any specific details of what conditions the term entailed, including the question of whether the interest rate on the first mortgage would be escalated as the defendant had the right to do under paragraph 8 of the first mortgage instrument, and including the question of whether the purchasers would be required to assume the first mortgage."
After a thorough review of the record, we are of the opinion that the trial court's findings in this regard are correct. The Cantrells have not offered even a scintilla of evidence that City Federal, by and through its president Jesse Miller, promised to keep the interest at 10 1/2%. It is clear from the depositions and affidavits introduced that William Cantrell and Mullins believed that, when Miller said a wraparound mortgage would be "no problem," this meant that the interest rate would *Page 751 
remain at 10 1/2% on the first mortgage. Neither Cantrell nor Mullins ever stated that anyone from City Federal told them specifically that the interest rate would be 10 1/2%; rather, the only figure ever mentioned when the parties to the suit discussed the interest rate was 11 1/2%. Because there was no agreement with respect to the interest rate on the first mortgage, there was no enforceable contract. City of Montgomeryv. Maull, 344 So.2d 492 (Ala. 1977).
It is well settled in Alabama that a summary judgment will not be granted unless there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Rule 56 (c), A.R.Civ.P.; Henderson v. Winkler,454 So.2d 1358 (Ala. 1984). In this case, the Cantrells have failed to offer even a scintilla of evidence in support of their claim that City Federal promised not to raise the interest rate on the first mortgage if the Cantrells took a wraparound second mortgage, and, therefore, in this respect, the trial court's summary judgment was appropriate.
The Cantrells' second contention is that there were facts introduced which support their claim for relief based on the theory of promissory estoppel, as that theory is set out inRestatement (Second) of Contracts § 90 (1) (1979). That section provides:
 "(1) a promise which a promisor should reasonably expect to induce action or forbearance on the part of the promissee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires."
The Cantrells assert that Jesse Miller made a promise to them that he should have known would cause them to act and which did cause them to act to their detriment. The so-called "promise" that Miller is alleged to have made was that a wraparound mortgage would be no problem. First, this does not appear to us to be a promise on City Federal's part to do or refrain from doing anything. Even viewing the facts in a light most favorable to the Cantrells, we are of the opinion that, even if this language could be construed as a promise to allow a wraparound mortgage, there is not one shred of evidence that he promised to keep the interest rate for the first mortgage at 10 1/2%. To the contrary, all statements made by City Federal concerning the interest rate of the proposed wraparound mortgage were to the effect that the interest rate would be 11 1/2%. Without a promise on City Federal's part upon which the Cantrells could have relied, they cannot recover based on a promissory estoppel theory.
For all of the above-stated reasons, the judgment of the trial court is due to be, and it hereby is, affirmed.
AFFIRMED.
TORBERT, C.J., and JONES, SHORES, ADAMS and STEAGALL, JJ., concur.